## FILBIN CORPORATION et al. v. UNITED STATES.

(District Court, E. D. South Carolina. August 26, 1920.)

No. 788.

**1. Eminent domain ⬄69—Taking either by "requisition" or by "condemnation" requires compensation.**

Any attempted distinction between requisition or condemnation of property by the United States is largely technical; in ordinary parlance, the word "requisition" being more often used with reference to the taking of personal property, and the word "condemnation" to the taking of real estate; but, whether the taking is by requisition or condemnation, Const. Amend. 5, requires just compensation to be made.

[Ed. Note.—For other definitions, see Words· and Phrases, First and Second Series, Condemnation; First Series, Requisition.]

**2. Eminent domain ⬄69—United States has same powers as government of England; "sovereignty."**

The "sovereignty" of the United States consists of the powers existing in the people as a whole and the persons to whom they have delegated

---

it, and not as a separate personal entity, and as such it does not possess the personal privileges of the sovereign of England; and the government, being restrained by a written Constitution, cannot take property without compensation, as can the English government by act of king, lords, and Parliament.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sovereignty.]

3. **Eminent domain ☞166—Exemption from suit does not permit government to take property without legal procedure.**

The exemption of the United States from suit by an individual does not affect the rule that the United States cannot take private property from a citizen, except in accordance with the 'formal rules governing procedure in such cases.

4. **Jury ☞19 (11)—Condemnation proceeding is "proceeding at common law," in which jury trial is guaranteed.**

A proceeding to ascertain just compensation for property taken for public purposes is a "proceeding at common law," in which the right to a trial by jury is guaranteed by Const. Amend. 7.

5. **Jury ☞19 (11)—Omission from statute of provisions for jury trial does not deprive owner of right.**

The omission, from a statute authorizing the taking of property by the United States, of any provision for trial by jury, does not deprive the owner of such right, though similar statutes for the taking of property expressly provided for jury trial.

6. **Jury ☞19 (11)—Existence does not authorize taking of property without jury trial as to compensation out of hostile zone.**

The existence of a state of war does not authorize the United States to take from a private citizen property situated outside the zone of hostilities, without a jury trial to determine compensation, where the civil laws and courts are in operation, though it might take such property without a jury trial, where martial law was in force.

7. **Statutes ☞237—Rule against construction in derogation of sovereignty not applicable here.**

The ancient rule, applicable in the courts of Great Britain, that a statute in derogation of sovereignty must be construed in favor of the sovereign and against the subject, is not applicable in the United States, where there is no sovereign, in a feudal or monarchical sense, and no subject.

8. **Jury ☞10—Statute construed, so as not to defeat common-law right to jury trial.**

The construction of a statute, so as to deny the common-law right to trial by jury to determine compensation for property taken by the government, is in derogation of common law, and should be avoided, if it can be.

9. **Eminent domain ☞209—If compensation for requisitioned property is determinable in equity, damages can be submitted to jury.**

If the right to recover compensation for property requisitioned by the government during war is an equity proceeding, which may be tried by the court without a jury, it may also be submitted to the jury by the court for its information and guidance.

At Law. Petition by the Filbin Corporation and another against the United States to recover compensation for property taken from petitioners. On motion by the United States for rehearing, modification, and revocation of an order directing the submission of the cause to a jury. Motion refused.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Buist & Buist and Miller, Huger, Wilbur & Miller, all of Charleston, S. C., for petitioners.

Francis H. Weston, U. S. Atty., of Columbia, S. C.

SMITH, District Judge. In this cause an order was made on the 28th May, 1920, by this court (265 Fed. 354), directing that it should be submitted to a jury at the next term of this court, or at any term thereafter, as soon as it could conveniently be tried, to determine in this cause the question as to what was a fair and reasonable value which would constitute the just compensation to be paid for the taking for public purposes of the lands mentioned and described in the petition herein.

On the 18th of June, 1920, due notice of motion was given on behalf of the United States that on the 25th of June, 1920, a motion would be made for a rehearing, modification and revocation of the order just before referred to, and this motion came on to be heard, and was fully heard on argument of counsel on both sides, including counsel from the Attorney General's office at Washington. These arguments have been most carefully considered by this court.

[1] On behalf of the government an argument has been submitted at length upon what is argued to be the difference between "requisition" and "condemnation." By this argument it is sought to establish that a difference exists between "requisition" and "condemnation," and whatever rule of law existed as to proceedings in condemnation being an action at common law, it would not apply to a requisition, which is not an action at common law, and, not being an action at common law, there was no right on the part of the owner of the property requisitioned to a trial before a jury upon the question of the compensation.

This argument, however, is very largely (it seems to the court) technical. Whether you call it a "requisition" or a "condemnation," if the result be the taking from the individual of property and subjecting it to the public use, the result is the same, and the proceeding is in substance the very same. In ordinary parlance—perhaps in legal parlance—the word "requisition" is the more often used in reference to the taking of personal property, and the word "condemnation" to the taking of real estate. This is not noted in the argument on behalf of the government, but it would follow therefrom, if any argument could be made from it, that, as the present proceeding is one to take real estate, it would be a proceeding in condemnation, and not in requisition.

The language of the Fifth Amendment to the Constitution of the United States is:

"Nor shall private property be taken for public use without just compensation."

Nothing is said about "requisition" or "condemnation"; the word used is "taken." The result of either condemnation or requisition is a *taking,* and therefore, in the opinion of the court, this amendment applies to the taking of private property, whether it be by requisition

or by condemnation; and both requisition and condemnation being exercised by virtue of the same provision of constitutional law, commonly called "eminent domain," which allows the interest of the individual to be subordinated to that of the public, and private property to be taken compulsorily for public use, in the opinion of the court, under the Constitution of the United States, there is no difference between a "requisition" and a "condemnation," so far as the obligation of the United States is concerned, to award to the owner just compensation.

[2] It is argued, however, that, though this may be the case, yet where the word used may be "requisition," and not "condemnation," it does not follow that the same rights to a trial by jury which would exist in a condemnation would exist under a requisition, because the sovereign in England and the sovereign states of the United States have at various times exercised the right both to requisition and to condemn, and to award compensation, without a trial before a jury.

It is to be noted that statutes of Great Britain and of the several colonies, as well as judicial decisions on the subject anterior to the American Revolution, and the adoption of written Constitutions, have little application and are of small assistance in the discussion of the question. In approaching this question, it is as well also to disabuse the mind at once that it was to be approached from the standpoint of what was the rule in England, from which the great body of the laws of this country are drawn. This has been too much lost sight of in the past.

The government of Great Britain, although ordinarily termed *free,* was in one sense (from the standpoint of this country) autocratic and despotic. Anything could be done by Parliament in its threefold combination of king, lords and commons. They were bound by no restrictions whatsoever. Any statute passed or law created by the consent of these three different powers, so to say, in the government, was absolute and binding upon any and all people. Life and property could be taken, and laws entirely abrogated, by the consent of these three powers.

There was no such thing as a written Constitution in Great Britain. It was a government whose governing power, as represented by Parliament, was autocratic. There were no protective provisions of a written Constitution to guard the people. Anything was lawful and constitutional that was done by Parliament. It is true there came to be certain unwritten rules of procedure and of protection, that Parliament had seen fit to follow for long periods, so as that they had come to look upon them as established rules or principles of the government; but they were in no way binding as such in the sense of the American Constitution.

Parallel in the American Constitution to the English Parliament are the President, the Senate, and the House of Representatives; but not even the unanimous consent of all three co-ordinate powers of the legislative and executive departments can make it lawful for them to do anything not permitted by the express powers conferred upon them by the written provisions of the Constitution of the United States.

This has been too much overlooked in analogies in the past, as also it has been too frequently the habit to ascribe to what was called *the sovereignty of the United States* those peculiar personal privileges and immunities which were in Great Britain attached to the sacred person of the king.

Drawing our law, as we did, from the body of English law, it was but natural that the vocabulary of that law, as well as its substantial terms, should be followed in this country; and the "sovereign," therefore, has been spoken of and declared in the law (in too many cases now to be subject to change) as a sacred entity, immune from all possibility of suit or prosecution; whereas in truth no such entity exists. The "sovereignty" consists of a power existing in the people as a whole and the persons to whom they have delegated it, and not as a separate semi-sacred personal entity.

Under the written provisions of the United States Constitution it is declared that private property shall not be taken for public purposes without just compensation. That is law which can be violated by no act of Congress, although concurred in by President, Senate, and House of Representatives.

[3] In the discussion of the principle as affected by the difference between the unwritten practice of the kingdom of Great Britain and the written constitutional provisions of the Constitution of the United States, great profit can be obtained from the learned decision of Mr. Justice Miller in the case of United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171.

As illustrating that principle may be the rule of law now adjudged, that the United States is exempt from suit or action, except where it consents to allow it. This exemption has been applied, not only to the United States, but to the several states. In many of the decisions holding it as law, it has been held so in analogy to the privilege or immunity which attached to the person of the sovereign in Great Britain. In the decisions to reject any such reasoning as existing in this republic it has been stated that the proper reason is that to allow any such action to be brought would be inconsistent with the very idea of a supreme executive power, and would injure the performance of the public duties of the government, to subject it to repeated suits as a matter of right, at the will of any citizen. But it appears upon consideration of all the authorities, while the doctrine has been enforced, it has never been satisfactorily placed upon any adjudicative reasoning. As is said by Mr. Justice Miller, in 106 U. S. at page 207, 1 Sup. Ct. 250:

"While the exemption of the United States and of the several states from being subjected as defendants to ordinary actions in the courts has since that time been repeatedly asserted here, the principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine."

It is therefore established law that the United States, as representing the government of the people of the United States, cannot be sued directly by original process as defendant. At the same time it is equally adjudicated law that no citizen of the United States can

have his property taken away from him, except in accordance with the formal rules governing procedure in such cases.

[4] It is also provided by the Seventh Amendment to the United States Constitution that in suits at common law the right of trial by jury shall be preserved, and the Supreme Court of the United States has decided that a proceeding to ascertain just compensation to be made for property taken for public purposes is a proceeding at common law. It follows, therefore, that the right of trial by jury must necessarily adhere to it. It is quite true that at common law there was no such thing as a suit to recover compensation for property taken by act of Parliament, because there was no obligation to award compensation for so doing. Parliament could take it without making any compensation; but it became entirely otherwise under the Constitution of the United States, when the Congress of the United States was not endowed with the power that Parliament possessed.

But it has been frequently decided that rights of the kind enforceable by actions at common law were in effect to be enforceable in such actions, and were actions at common law, and that would appear to be without doubt the meaning of the Supreme Court of the United States, when it decided that such a suit for the compensation to be paid for the taking in condemnation was in all respects akin to a suit at common law.

It would seem absurd to say that, if the United States sued a man on a contract or for a tort, in which it sought to make him pay more than the sum of $20, it could not deprive him of the right to have the issue tried by a jury, and then to say that, if the United States by virtue of any act of Congress desires to wrest from a man, under either requisition or condemnation, property claimed to be worth $1,000,000, that on that question, as to the quantum to be paid him, he is not entitled to a trial by jury!

[5] Furthermore, great stress is laid in the argument upon the circumstance that in many other cases in which the acts of Congress provided for allowing suits against the United States to recover claims for just compensation, such suits are expressly required to be tried by the court without a jury. Assuming this to be so, the argument would apparently be irresistible that, inasmuch as it required some such provision to deprive the party concerned of his right to a jury trial, where any such provision is omitted, such right of trial exists; and in the case of the statute under which these present proceedings are brought, there is no provision that it should be tried by the court without a jury, or anything expressly indicating any such intention.

Much is said on this point as to the necessity of urgent and speedy action in cases of requisition, as rendering it necessary to avoid the delay of jury trials, which, under the argument, is more or less sought to be made applicable to acts done for the purposes of war; and the argument is that, requisitions being made for the purposes of war, the same procedure is not required in this present case as is required in cases of condemnation in times of peace.

[6] Does the fact of the mere existence of a state of war between two countries abrogate all civil laws existing in either? It has never

been so held. The mere statement that there is a condition of war loses entire sight of the circumstances under which the urgency of war may exist. Many matters are permissible on the field of battle, or in the face of the enemy, or in the territory directly subject to the incursions of warfare, which are not permissible in the country entirely removed from it, where the population is orderly and is pursuing its usual avocations. In the course of an armed conflict, it may be entirely proper that the troops of the country, defending the country, take refuge from the fire of the enemy in the private house of a citizen of the country, which may lead to its destruction; and in such cases the government would not be liable to condemnation, as that is an incident to the struggle itself.

That would not mean, however, that 1,000 miles from the scene of conflict, in the midst of civil order and the enforcement of civil laws, the government could summarily take and destroy the house of a citizen without awarding him just compensation for the taking. Where martial law is proclaimed and enforced, the observation of the civil rules is for the time in abeyance. In the face of the enemy, it is permitted to try an alleged spy summarily before a drumhead court-martial, and execute him if found guilty; but that does not mean that 1,000 miles away from the scene of conflict, where the community is still in obedience to the orderly and civil rules of law, that an alleged spy can be tried and summarily executed under a court-martial, when the civil courts are open for his trial and punishment.

A state of war does not sanction summary requisitions for all purposes everywhere, but only in those places in which, by the necessities of the conflict, martial law is in force and civil law is suspended. It does not appear to the court, therefore, that there is anything in the argument that a state of war was existing between this country and Germany at the time, when the seat of conflict was 3,000 miles from the shores of this country; that such extraordinary powers could be given to an officer of the executive department of the United States, that he should be enabled to take property and deprive the citizen whose property is taken of the ascertainment of his compensation by due legal process and a trial by a jury.

[7] The argument in behalf of the government also insists that, inasmuch as the construction of the statute as one refusing trial by jury is one in derogation of sovereignty, it must be construed in favor of the sovereign and against the subject, which is nothing but a repetition of the use of the words "sovereign" and "subject" in the ancient rule applicable in the courts of Great Britain. Who is the sovereign in the United States? and who is the subject? The United States has sovereignty in the sense of a paramount government, but is not a sovereign in any feudal or monarchical sense; and it has citizens and inhabitants who are not subjects in any feudal or monarchical sense. The use of the words "sovereign" and "subject" have been adopted and applied from the vocabulary of English law, but not with the meaning they have in British statutes and decisions.

[8] The general rule is that all statutes in derogation of common law—that is, of common right—are to be strictly construed, and, if such be the proper rule, any statute which is in derogation of the common right of trial by jury should not be given such construction if it can be avoided.

It does not seem necessary here to repeat the analogies and consideration of all the adjudicated precedents. It is not to be denied that they are conflicting, and (it is not too strong to say) almost irreconcilable. The general rule to be gathered from them is that there is no such thing as personal sovereignty in the United States, and that all laws and rules of England or the kingdom of Great Britain, which were sustainable upon the ground that they affected the personal privileges, rights, and immunities of a personal sovereignty, are not of force.

The rights and privileges, as against the government of the United States, which are of force, are those which are based upon the reasons that they are necessary for the performance of the public duties of the administration for the time being, and anything that would tend to endanger or destroy that, by preventing the carrying on of the government in war and peace, according to the injunctions of the constitutional contract forming the basis of government and order; and such are enforced, not because of any personal attribute, but as necessary for the continuation of the government and effectuation of its ends and purposes.

The statute under which this action is brought, if it does not by the language used expressly permit trial by jury, in no wise prohibits it; and it would seem that, if ordinarily the party would be entitled to a trial by jury, the inference would be that there should be a special prohibition to deprive him of it.

[9] If, however, the case were one in which the court might have the option or the power to try the case without the intervention of a jury, because the declaration of the statute is that the United States District Courts shall have jurisdiction to hear and determine the controversy—if under that it be held that the proceeding is similar to an equity proceeding, and the matter may be tried by the court without the intervention of a jury, then likewise the equitable rule would come in that the chancellor has a right to submit the question to a jury for the assistance and information of his conscience in coming to his conclusions; and in the opinion of the court the issue in this case is among those issues, like that of assessing damages in an equity suit, or ascertaining title in an equity suit—one which should be submitted to a jury.

For all these reasons, the court is of the opinion that its order in this case, filed May 28, 1920, referring the matter to a jury, was correct and proper; and the motion to modify, change, or revoke the same is accordingly refused.