Robert K. **HITKE** and La Verne E. **Hitke,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

Robert L. **DAHME** and Dolores K. **Dahme,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

Kurt **HITKE** and Anna **Hitke,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

Nos. 13415–13417.

United States Court of Appeals
Seventh Circuit.

Dec. 7, 1961.

Wyatt Jacobs, Chicago, Ill., Jacobs & McKenna, Chicago, Ill., of counsel, for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Donald P. Horwitz, Lee A. Jackson, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

The respective husband-wife petitioners have petitioned for a review of the decisions of the Tax Court of the United States entered on March 13, 1961. T. C. Memo. 1961–66, filed March 10, 1961. The three cases were consolidated for trial and for review in this court.[1]

The Tax Court found deficiencies due from petitioners for the taxable year 1955 in the aggregate amount of $125,-811.38.

The deficiencies arose from the Commissioner's disallowance as a tax-free exchange of a sum realized upon exchange of stock of Exchange Management Company (Management) for stock of Exchange Insurance Company (E-I) and the treatment of the sum as a capital gain. Petitioners' theory is that the ex-

1. In the Tax Court, petitioners were Robert K. Hitke and La Verne E. Hitke, husband and wife, Docket No. 81383; Robert L. Dahme and Dolores K. Dahme, husband and wife, Docket No. 81386; Kurt Hitke and Anna Hitke, husband and wife, Docket No. 81389. These proceedings were docketed in this court as Nos. 13415, 13416 and 13417, respectively. Kurt and Anna Hitke are the parents of Robert K. Hitke and Dolores K. Dahme.

change was an involuntary conversion within the meaning of Section 1033 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1033.[2] Petitioners further contend that the determination of the value of the stock received in the exchange was clearly erroneous.

There is no dispute as to the facts, most of which were stipulated. The relevant facts as found by the Tax Court and stated in its opinion may be generally summarized in the following narrative.

At all times material, petitioners and other members of their family owned all the stock of Kurt Hitke & Company, Inc. (K-H), a general insurance agency that had specialized in taxicab, liquor liability and other hard-to-place lines of insurance and substandard risks since 1932.

Before 1947, the primary market for placing risks by K-H had been Citizens Casualty Company of New York. In 1947, due to an ordinance raising limits of liability, Citizens Casualty was no longer accepting Illinois taxicab risks. Lacking a market, K-H joined with another firm, Bergman & Lefkow (B & L), in organizing Management to act as attorney-in-fact for a reciprocal insurance company, Exchange Insurance Association (Association), formed shortly after Management.

The stock of Management was owned as follows:

B & L and related interests ......50%
K-H and related interests ........45%
William Shapiro ................ 5%

William Shapiro was the general manager of K-H.

Management managed Association for a fee, and a voting trust was created whereby Kurt Hitke and Samuel Bergman were constituted co-equal trustees, each with the power to vote 50% of Management's stock.

In December of 1953, Management, as agent for Association, organized E-I. E-I was a stock casualty corporation with $200,000 capital and $100,000 paid-in surplus. In March of 1954, all stock of E-I was transferred at cost to Association to complete the transaction. E-I had been formed to provide an additional market for the insurance business being produced by K-H and B & L, and eventually to take over the business then being conducted by Association.

Immediately before the events occurred which culminated in the exchange involved here, B & L and K-H were placing approximately five million dollars of insurance annually with E-I and Association. K-H accounted for approximately four million, while B & L accounted for one million. K-H and B & L each had a 50% interest in Management, attorney-in-fact for Association. Association, in turn, held all the stock of E-I.

In March of 1955, William Shapiro transferred his "allegiance" to the interests represented by B & L, giving B & L 55% control of Management. On April 13, 1955, Samuel Bergman sent telegrams to the Hitke group and the officers of E-I calling meetings of the boards of directors of Management and E-I for various purposes, among which were proposals to cancel contracts with K-H and the Hitkes and to remove the Hitkes and Dahmes as officers. Petitioners commenced litigation in the Circuit Court of Cook County, Illinois to block the proposals set out in the telegrams and secured a temporary injunction for that purpose. Had Bergman accomplished his purpose, K-H would have been effectively precluded from placing further insurance risks with E-I or Association, although retaining their 45% stock interest in Management.

As the result of negotiations, however, a settlement was effected. Management

---

2. "§ 1033. Involuntary conversions
   "(a) General rule.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—
   "(1) Conversion into similar property. —Into property similar or related in service or use to the property so converted, no gain shall be recognized."

acquired all the shares of E-I for cash at book value of $508,246.30, which was the surplus of E-I on March 31, 1955. Petitioners then surrendered all their stock in Management and received all the stock of E-I, as follows:

|  | Management Shares Surrendered | E-I Shares Received |
|---|---|---|
| Kurt and Anna Hitke ...:.. | 100 | 6,000 |
| Robert K. and La Verne E. Hitke ............... | 200 | 12,000 |
| Robert L. and Dolores K. Dahme ............. | 200 | 12,000 |

It is stipulated that petitioners' tax basis in the Management shares was as follows:

Kurt and Anna Hitke ............$1,000
Robert K. and La Verne E. Hitke .. 2,000
Robert L. and Dolores K. Dahme ... 2,000

As a result of this exchange, K-H retained a market for its insurance business. As a market, E-I had a substantial value to petitioners apart from its value as an investment for others.

The Commissioner determined that the total value of E-I stock received by petitioners in the exchange was $508,246.30. This was the amount paid by Management for the stock; it was the amount at which Association had carried the stock on its books; and it was the liquidating value of the stock on March 31, 1955. The Tax Court accepted the Commissioner's determination.

It is this exchange of Management stock for E-I stock which petitioners contend was an involuntary conversion. Their theory is that apart from the settlement reached, the only other alternatives were "seizure" by Bergman or receivership under the Illinois Insurance Code;[3] that these two alternatives were no choices at all, and thus, the settlement was involuntary.

Petitioners further contend that if the exchange was taxable, the Tax Court clearly erred in determining the value of the stock received in the exchange. This contention is based on expert testimony

3. The relevant portions of Ill.Rev.Stat. Ch. 73 § 800 (1955) read as follows:
   "Whenever any domestic company
     *   *   *   *   *
   "(e) is found to be in such condition that its further transaction of business would be hazardous to its policyholders, or to its creditors, or to the public; or
     *   *   *   *   *
   "(j) has commenced, or has attempted to commence, any voluntary liquidation or dissolution proceeding, or any proceeding to procure the appointment of a receiver, liquidator, rehabilitator, sequestrator or similar officer for itself;
     *   *   *   *   *
   then the Director shall report any such case to the Attorney General of this State whose duty it shall be to apply forthwith by petition on relation of the Director in the name of the People of the State of Illinois to the Circuit or Superior Court of the county in which the principal office of such company is located for an order directing such company, upon such notice as the Circuit or Superior Court may prescribe, to show cause why an order to rehabilitate or liquidate the company should not be entered as provided in this article, and for such other relief as the nature of the case and the interests of its policyholders, creditors, members, stockholders or the public may require. * * *"

to the effect that the market value of E-I stock in 1955 was not over 25% of the liquidating value. The contention is also based on subsequent developments which showed that the loss reserves of E-I were under-reserved by $106,589.69, making the 1955 surplus of E-I $401,656.61, instead of $508,246.30.

The issues before us are correctly stated in respondent's brief as follows:

1. Was the Tax Court correct in determining that the exchange of stock in settlement of a stockholders' dispute was not an involuntary conversion within the meaning of Section 1033 of the Internal Revenue Code of 1954?

2. Was the action of the Tax Court clearly erroneous in approving the Commissioner's determination that the property acquired by the taxpayers in the exchange had a value of $508,246.30?

■ Petitioners assert that the issues of destruction and seizure under the statute are on the facts of this case essentially of first impression. They further concede that the instant facts do not involve a condemnation or the threat or imminence of a condemnation.

Petitioners would have us hold that the threats by Bergman, after gaining control of Management and E-I, to cause the insurance companies to discontinue doing business with petitioners, constituted a seizure of property and a resulting destruction of their interests in the use of their two markets for placing insurance. They argue that the only alternative to settlement was receivership of the markets by operation of law at the instance of the State of Illinois for the protection of the public. That the resulting settlement of May, 1955 was consequently an involuntary conversion within the purpose and scope of Section 1033 of the Internal Revenue Code. We do not agree.

We have here a stockholders' dispute wherein the majority interests began a business maneuver which threatened to put the minority at a competitive disadvantage. Short of further action they

reconciled their differences and effected a settlement.

In a case far stronger on its facts in favor of the taxpayer than the instant case, it was held that the disposition of stock in the settlement of a stockholders' dispute was not an "involuntary conversion" of taxpayer's property by reason of its "requisition or condemnation thereof" within the meaning of the statute. Dear Publication & Radio, Inc. v. C. I. R., 31 T.C. 1168, affirmed, 3 Cir., 274 F.2d 656 (1960). The statute under consideration there was Section 112(f) of the Internal Revenue Code of 1939, which parallels Section 1033 of the 1954 Code.

In Dear, a stockholders' deadlock resulted in dissolution proceedings under which a state court held that dissolution should be granted and that a receiver should be appointed by the court to sell the corporate assets. Prior to entry of the court's judgment, the parties entered into a competitive bidding agreement whereby each agreed to bid for the other's fifty per cent stock interest. At the subsequent auction, taxpayer's stock was purchased and, following consummation of the sale and stock assignment, the state court action was dismissed. Thereafter, taxpayer used the proceeds of the sale of its stock to purchase other properties. The Third Circuit affirmed a decision of the Tax Court that such sale was not an involuntary conversion within the meaning of the statute. See, also, Robins v. Commissioner, 15 B.T.A. 1068, 1072 (1929); Tirrell v. Commissioner, 14 B.T.A. 1399 (1929); American Natural Gas Company v. United States, Ct.Cl., 279 F.2d 220, 225–26 (1960), cert. denied, 364 U.S. 900, 81 S.Ct. 232, 5 L.Ed. 2d 193; Behr-Manning Corporation v. United States, D.C. Mass., 196 F.Supp. 129, 132–33 (1961).

The effect of the settlement in the instant case was that petitioners divested themselves of their Management shares in exchange for E-I shares with a resulting division of the markets in which both Bergman and petitioners formerly had interests. Each finally had one separate market instead of an interest in two.

Under the circumstances of this case, we agree with the Tax Court that such a stock exchange, although compelled by economic, business or personal considerations, is not an involuntary conversion within the purview of the statute.

We think petitioners' reliance upon Gidwitz, Exr. v. Lanzit Cor. Box Co., 20 Ill.2d 208, 170 N.E.2d 131 (1960), as authority that the facts of this case constitute a "seizure" under Illinois law, is misplaced. That case merely dealt with the right of stockholders to compel a corporate dissolution under an Illinois statute where it was shown that in a director and stockholder deadlock certain actions of those in control of the corporation were guilty of "oppressive" conduct.

Petitioners' contention that there was a threatened requisition by operation of the Illinois Insurance Code pursuant to its receivership provisions, supra, is without merit. There is nothing in the record to show that any official of Illinois ever took part in or had any interest in the transactions between petitioners and Bergman. Under the cases cited above, sales or exchanges made due to such considerations have been held not to be involuntary conversions within the meaning of the statute.

■ . It seems to us that a fair reading of the legislative history of the statute cited to us and the rationale of the cases which have considered the language of the statute indicate that the involuntary conversion referred to must result from (1) the destruction of the property in whole or in part; or (2) the theft of the property; or (3) the actual seizure of the property; or (4) the requisition or condemnation of the property or the threat or imminence of requisition or condemnation. This is consistent with Treasury Regulations on Income Tax. Treas.Reg. § 1.1033(a)–1 (1956). Cf., Sections 214 and 234 of the 1921 Code; Section 112 of the 1939 Code. It is clear to us that the "threat or imminence thereof" is limited to "requisition or condemnation" and does not relate to destruction, theft or seizure.

■ The remaining question concerns the Tax Court's approval of a value of $508,246.30 ascribed by the Commissioner to the property received by petitioners in this transaction and its determination that this was the proper amount of taxable gain.

Petitioners had the burden of proving in the Tax Court the propriety of a lower valuation, and on review here to demonstrate that the Tax Court's finding is clearly erroneous.

The Commissioner based his assessment on the book value of the stock at the time the exchange was made. The Tax Court considered the testimony of the witnesses called by petitioners with reference to the valuation of the E–I stock. It noted that the stock had a value to petitioners over and above that which the shares might have brought on the market. It had before it the testimony of petitioners' witnesses that at the time of the transaction the reserves appeared to be adequate and satisfactory and that it was not until later years that unforeseen increases in losses appeared. It observed that the apparent hostile feelings between petitioners and Bergman compelled the conclusion that the settlement was an arm's length transaction and that the value of the shares fixed by the parties (the book value) must have entered into the negotiations. The Tax Court was unable to find from petitioners' evidence "a value any lower than the figure reached by the Commissioner."

On our review of the record, we conclude that the Tax Court did not err in finding that the Commissioner's use of the book value was not arbitrary and capricious. We hold that its determination of this same value has adequate support in the record and is not clearly erroneous.

For the reasons stated, the decisions of the Tax Court before us for review are held to be correct and they are each affirmed.

Affirmed.